NEWSPAPERS, INC., Appellant,

v.

Gerald Witt LOVE et al., Appellees.

No. 11342.

Court of Civil Appeals of Texas.

Austin.

Dec. 15, 1965.

Rehearing Denied Jan. 5, 1966.

Coleman Gay, Austin, Jackson, Walker, Winstead, Cantwell & Miller, W. B. Patterson, Jack Pew, Jr., Dallas, for appellant.

Byrd, Davis & Eisenberg, L. Tonnett Byrd, Tom D. Blackwell, Austin, for appellees.

HUGHES, Justice.

This is the second appeal of this case. The opinions of this Court and the Supreme Court are found in 367 S.W.2d 185 and 380 S.W.2d 582, respectively. The parties here are the same as before.

We refer to those opinions for a general understanding of this controversy.

On the former trial the judgment, which we affirmed, was for $94,654.00. The appellant, Newspapers, Inc., contended that this judgment was excessive. The judgment from which this appeal is taken totals $130,401.90. There is no contention that this judgment is, in the usual sense, excessive.

On the former appeal we considered and overruled points of error made by appellant to the effect that there was no evidence to support jury findings that Cargile, appellant's district manager with whose negligence appellant was sought to be charged, was not an independent contractor in his relationship with appellant and that the relationship between them was such that appellant "retained or exercised the power to control" not merely the end sought to be accomplished through such relationship but also the means and details of its accomplishment.

We also there considered and overruled appellant's points that these findings were so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We also held on the former appeal that evidence of control exercised by appellant over two of its former district managers was admissible on the issues concerning the

true relationship between appellant and Cargile.

All of the above points were presented by appellant to the Supreme Court in its application for writ of error.

As we understand the opinion of the Supreme Court in reversing our judgment it did so on the sole ground that Special Issue No. 1 was improperly framed in that the inquiry should have been limited to the "right of control," and "exercise of control" should have been excluded.

In concluding its opinion, the Supreme Court stated, "Other matters discussed by the Court of Civil Appeals need not arise upon another trial," and the judgments of this Court and the trial court were reversed and "this cause remanded to the District Court for another trial."

█ When this Court reverses and remands a case for retrial we deem it our duty under the decision in Sutherland v. Friedenbloom, 200 S.W. 1099, El Paso, writ ref., to determine all questions properly presented which are likely to recur upon retrial. We quote from such authority:

"It is true that the question of res judicata was the only one upon the former appeal this court must necessarily have passed upon, but, when this was answered in Friedenbloom's favor, it became apparent upon the face of the record that the rights of the parties depended upon the question which is now presented. And McAfee upon that appeal, in support of an affirmance, was urging the illegality of the transaction upon the same grounds here presented, and contending that by reason of such illegality Friedenbloom could not recover. In this state of the record it was deemed proper to consider the question, and indicate to the trial court the view of this court, so that the former could be governed thereby upon retrial, and prevent the possibility of the case being tried upon a theory which this court could not

approve. It has been a constant custom of our courts to pursue this practice. The Reports are full of instances where cases have been reversed upon issues collateral to the controlling one, and, for the guidance of the lower court upon retrial, the opinion of the appellate court has been expressed upon such controlling question, though such holding was not necessary to the disposition of the appeal. If, in such cases, such holdings are to be regarded as mere dictum, then our courts from their very inception have been pursuing a very improper practice. We cannot give our assent to the proposition that such holdings are mere dictum. They serve a most useful purpose by preventing unnecessary appeals to invoke a ruling upon a controlling question, and, when made in a proper case, they should be regarded as authoritative. In Black's Law of Judicial Precedents, p. 180, § 58, it is said:

'When an appellate court reverses the judgment of the court below and remands the case for further proceedings, and in its opinion states the rules and principles of law which are to be applied to the questions likely to arise upon the new trial, these statements are not to be regarded as dicta, although they are additional to the determination of the judgment.' "

The only specific rules, here pertinent, applicable to the Supreme Court of which we are aware are Rules 503 and 505, Texas Rules of Civil Procedure, the latter Rule providing, in part, that the Court shall "remand the case to the lower court, if it shall appear that the justice of the case demands another trial."

We will advert to this Rule and to the preliminary discussion made above later in this opinion in disposing of points made by appellant which were before this Court on the former appeal, and were decided by us, and which were presented to the Supreme Court and which are again presented

under substantially the same record and which must, of necessity, have been anticipated would recur upon retrial.

This trial was to a jury which made these findings: (1) On April 11, 1959, appellant and Cargile had a written contract, signed by both parties. This is, in substance, the same contract described in our former opinion.[1] (2) Prior to the collision involved in this suit such contract had been abandoned, in whole or in part, insofar as its provisions concerning control of the details of the work (of Cargile) was concerned. (3) Cargile was, on April 1, 1959, an agent of appellant. (4) Cargile failed to keep a proper lookout for vehicles approaching from the rear, and this was a proximate cause of the collision. (5) Before the Franklin car passed the Cargile car, Cargile turned his car to the left at a time when he could not do so with safety, and this was a proximate cause of the collision. (6) Two negligent acts of Mr. Otis Franklin who was driving the "Franklin" car were found not to be the sole proximate cause of the collision.

Appellant's first ten points are jointly briefed. We will discuss them together. These ten points are, in substance: (1) There being no evidence that the parties had abandoned the independent contractor contract between them and no evidence that they agreed that Cargile would be a servant of appellant, judgment should have been rendered for appellant. (2) There was no evidence to support the jury finding that such contract had been abandoned. (3) The evidence is insufficient to support such finding. (4) Such finding is against the weight and preponderance of the evidence. (5) The jury finding that Cargile was an agent of appellant is immaterial since there was no evidence to support the finding of the jury referred to in Point 2, the jury being instructed to answer this

issue only in the event it made the finding it did make in Point 2. (6) (7) These Points are the same as Number (5) above except it is asserted that the finding referred to in Point 2 was against the weight and preponderance of the evidence, and the evidence to support it was insufficient. (8) There is no evidence to support the jury finding that Cargile was an agent of appellant. (9) The evidence was insufficient to support this finding. (10) This finding is against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

Before detailing the evidence on the controverted jury findings, we make these observations:

We attribute no importance to the jury finding that appellant and Cargile had signed a contract making Cargile an independent contractor in evaluating either the opinion of the Supreme Court or the opinion of this Court on the former appeal because the existence of such contract was assumed by both Courts in their disposition of the case.

█ We are of the opinion that the jury finding that appellant and Cargile had abandoned the contract above mentioned insofar as the provisions relating to control of the details of the work were concerned was not a controlling issue and should not have been submitted. The controlling issue, in our opinion, was the issue in answer to which the jury found that Cargile was an agent of appellant. In connection with this issue the jury was instructed, in part, "that the term 'agent,' means a person who undertakes to do work for another person whereby such other person has the right to control, not merely the end sought to be accomplished but also the means and details of its accomplishment, not merely what should be done but how and when it should be done."

1. In addition to the provisions of the contract there described or quoted, the contract provided that a performance bond was to be furnished by Cargile on request, and it provided that the paper rates could be altered only on agreement of the parties thereto.

No objection to this charge is brought forward. It conformed to the opinion of the Supreme Court herein wherein it stated, "The fact remains, however, that the 'right of control' remains the supreme test * *." The Court also stated, " * * * the terms of the agreement between the parties is of importance in determining the existence of a master-servant relationship and that the essential inquiry is whether or not the employer has the contract right to control the opposite contracting party in the details of the work to be performed. * * * A highly important evidentiary matter bearing directly upon the crucial or controlling issue is whether the written contract between Newspapers, Inc., and Cargile was a subterfuge or whether it had been abandoned in whole or in part insofar as the *right* to control the details of the work is concerned."

Since the written contract between appellant and Cargile provided that appellant should not have any right to control him in the details of his work it is obvious that the jury finding that their relationship was that of master and servant, under the Court's instructions in connection with it, is, in effect, a finding that the written contract has been abandoned insofar as the provision of the contract above noted is concerned.

We state the substance of the evidence relating to the jury findings which appellant challenges in these ten points.

On and prior to April 11, 1959, F. V. Wheeless, Mayes Behrman and Cargile were district managers for Newspapers, Inc., and all three worked under the supervision of Phil Granath, city circulation manager, and P. F. Fincher, general circulation manager.

It is uncontroverted that Cargile, Wheeless and Behrman all were operating under the same contract and that the business relationship that existed between the Newspaper and Wheeless and Behrman was exactly the same business relationship that existed between the Newspaper and Cargile.

Cargile had a district small enough so that he could deliver and collect for his papers with the assistance of only one assistant, but Wheeless and Behrman had larger districts which required the regular use of several carrier boys. Other than that distinction, there was no difference in their working arrangement with the Newspaper.

Although witnesses for appellant referred to Cargile as a "route carrier" rather than a "district manager," it is clear that the designation "route carrier" only refers to the manner in which papers were delivered and collected for in a particular area. Most districts had both types of carriers; that is, "route carriers" who used motor vehicles and "regular carriers" who walked.

Cargile could have used regular carrier boys if he had needed them. However, most of the time he had only one assistant under his supervision.

The evidence in this record showing a right of control by the Newspaper over the district managers generally is as follows:

(1) The Newspaper rigidly controlled the price district managers paid for papers, the price such managers charged carrier boys for the papers and the price subscribers paid for papers.

(2) District managers were required to personally pick up their papers shortly after they came off the press. They were not permitted to act for each other in this respect nor could they hire a third party to do the work for them.

(3) District managers were required to complete their delivery before a specified deadline set by the Newspaper. The purpose of this time limit was to achieve early delivery.

(4) Each district manager was required to call the newspaper office at regular specified time intervals to inquire about customer complaints regarding the delivery or non-delivery of papers. District managers were not permitted to alter the time and method of handling

these complaints. District managers were not permitted to act for each other in the matter of complaints. They were required to handle their complaints personally.

(5) District managers were not allowed to deliver hand bills or circulars along with papers. Some of the managers were earning extra money by performing this service and the Newspaper compelled them to stop.

(6) District managers were required "to devote their full time and efforts to the job of being a manager."

(7) District managers were required to deposit the Newspaper's portion of collections in a special bank account and to deliver the deposit slips to the Newspaper at its office.

(8) District managers worked for only one newspaper and supervision of their work by the Newspaper was a daily occurrence.

(9) The size and location of delivery districts were changed by the Newspaper at will and without regard to the wishes of the district managers. The cost of the papers was not the same for all district managers and it was changed by the Newspaper at will and without regard to the wishes of the managers. In this way their compensation was controlled. The size and location of delivery districts coupled with the specified deadline for completion of delivery controlled the method of delivery used by the district managers.

(10) In some areas district managers were required to place the newspapers on their subscribers' porch, regardless of weather.

(11) District managers were required by the Newspaper to keep a special set of books showing how many papers were actually delivered to subscribers. This was essential to the Newspaper

for the purpose of pricing and selling advertising space.

(12) Salesmanship schools were conducted by the Newspaper and the district managers were required to attend. The Austin High School facilities were used for their salesmanship schools and a teacher was provided as a sales instructor. These arrangements were presumably made by the Newspaper, as the district managers did not make them.

(13) When customers paid in advance for their papers, the Newspaper took control of the money and paid the district managers on a monthly pro rata basis until each paid-in-advance subscription expired.

(14) District managers were not permitted to compete with each other by cutting prices, nor were they permitted to reduce the price of the paper in an effort to increase their volume of sales.

(15) District managers were not free to run their districts in their own way. They were required to conduct their work in a specific way designated by the Newspaper, and such right of control was demonstrated on a daily basis.

(16) In their actual operations, the Newspaper and the district managers "did not live by their contracts."

(17) The district managers were furnished receipt pads which they used in collecting from subscribers. These were provided without cost.

(18) Upon request the district managers were required to furnish the Newspaper with the names and addresses of all persons to whom they had delivered papers.

(19) District managers were required to be bonded.

(20) The Newspaper had an absolute right to terminate the district managers' contracts on ten days notice.

The evidence in this record showing a right of control by the Newspaper over the district managers in their dealings with carrier boy employees is as follows:

(1) District managers were controlled by the Newspaper in the selection of their carriers. They were required to employ young boys rather than older men.

(2) District managers were required to personally supervise their carrier boy employees, Mr. Granath, a Newspaper witness, testifying, " * * * to see that the boys were up to wake them up if necessary, to make good delivery."

(3) District managers were required to file with the Newspaper certain records showing how many papers were sold to each carrier boy and how much each carrier boy paid for his papers. This was to protect the carrier boy from being cheated by the district managers.

(4) District managers were instructed to sign all carrier boys to contracts and the contract forms were furnished to the district managers without cost.

(5) The carrier boys were furnished receipt pads which they used in collecting for subscriptions. These were provided without cost.

(6) Salesmanship schools were conducted by the Newspaper and the carrier boys were required to attend. The Austin High School facilities were used for this purpose and a school teacher was provided as a sales instructor. These arrangements were presumably made by the Newspaper, as the carrier boys did not make them.

The following is from the testimony of Mayes Behrman:

"A I told Mr. Granath that it seemed to me—this occurred in the first summer of my work there—that it seemed to me that we were being much more controlled than the terms of the contract allowed, and his response to me was that—he said, 'Behrman, you should know by now that contract is not worth the paper it is written on. It is meant to protect the company.' "

Phil Granath, appellant's city circulation manager, testified as follows:

"Q All right. Now—and in all my questions with you, please, sir, since Mr. Cargile is the one involved in this lawsuit, relate all my questions to Mr. Cargile only, please, sir, and not some other person. Now, in your operations with Mr. Cargile under this contract, tell us what the facts are as to whether or not you ever directed Mr. Cargile to do anything other than to follow the terms of that contract.

A That is all I ever did, was quote the contract.

Q With reference to Mr. Cargile, did you daily supervise him?

A No, sir.

Q About how often would you see Mr. Cargile?

A Well, sometimes it would be a month or so.

* * * * * *

Q All right. Are you familiar with the type of route that Mr. Cargile had?

A Oh, yes, sir.

Q And what type of route was that?

A What we ordinarily call a motor route.

Q And what was Mr. Cargile's designation with the newspaper—what did you all call the fellow that contracted like he did?

A He was a motor route carrier.

Q Is there to the newspaper a material difference between a motor route carrier and a district dealer?

A Well, yes, inasmuch as the motor route carrier does all of his own operation, delivering and collecting, whereas the district manager has carriers that he contracts with.

Q Did Mr. Cargile comply with the terms of his agreement that he would put up a bond with the newspaper prior to April 11, 1959?

A Yes, sir.

Q Over a period of, say, a couple years prior to April 11, 1959, can you at this time recall any specific instance when you even discussed with Mr. Cargile what he was doing or he was not doing out there on his route?

A Sir, I saw him very seldom, and we had no reason to go into any of his business."

Mr. Granath's superior Mr. P. F. Fincher, testified:

"Q Mr. Fincher, is it not true that you supervise these managers,—that is, Mr. Wheeless, Mr. Cargile and all the other route managers—on a daily basis for the purpose of improving not only their business but yours and improving your newspaper business in general; it is a daily supervision thing, isn't it, sir?

A Well, with Mr. Cargile, we may see him once a month. The reason we would see Mr. Wheeless—

Q Now, I didn't ask that question.

A Well, you did say did we supervise them daily, and I am answering no.

Q Your answer is no?

A We do not supervise Mr. Cargile daily. The only reason we ever see Mr. Wheeless, he comes in daily."

Mr. Fincher also testified:

"Q Now, of course, that means, of course, that from time to time you all amended your written contract with instructions and little agreements orally, didn't you?

A Well, I don't know about any oral agreements. We try to restrict them to written agreements and put it all down in black and white.

Q All right. I understand, but from time to time you would amend your written agreements orally, and then later on change them at a later time, wouldn't you?

A That could be, yes, sir."

There is also in evidence a letter from Mr. Granath to Mr. Wheeless in which he stated, "It is our desire to terminate all contractual agreements with you either written or oral on January 1, 1961."

If the testimony in the former trial, set out at length in the opinion of this Court, is examined it will appear that it is, in substance, the same as is now before us. The principal differences are that on this trial it is shown that Mr. Cargile had one helper or employe whereas on the first trial it was not shown that he had any helpers other than members of his family, and the other difference being that Mr. Cargile was not a witness on this trial. This Court, in its former opinion, quoted some of the testimony of Mr. Cargile as bearing on the relationship between him and appellant. We considered such testimony and gave it weight in reaching our decision. With reference to this testimony, the Supreme Court said, "However, the statements of Cargile in this deposition relate to his opinions or conclusions as to the relationship between him and Newspapers, Inc. and not to any definite or specific acts of control exercised by Newspapers, Inc. over Cargile's actions other than such as were consistent with an independent contractor relationship such as directing when Cargile should pick up his papers and when he should deliver them."

It thus appears that the Supreme Court gave little, if any, weight to the testimony of Mr. Cargile; hence, its absence here is not of paramount importance.

Since it is our view of this record that the evidence now before us is in substance the same as considered by us on the former appeal and not being convinced that we there wrongfully appraised it, we adhere to such appraisal and refer to our discussion there made of it. Accordingly, we overrule appellant's first ten points, using the appropriate rules for deciding the no evidence points and points pertaining to the weight of the evidence as stated in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

Insofar as the "no evidence" points among the first ten are concerned, we are of the opinion that the Supreme Court has determined that there is, or at least was, evidence to legally sustain a finding that Cargile was a servant of appellant.

■ Reverting now to the rule which obligates this Court to determine questions which are likely to recur when a case is re- tried after a remand, we are confident that this obligation also rests upon the Supreme Court, as to questions properly before it and of which it has jurisdiction.

In Rogers v. Blake, 150 Tex. 373, 240 S.W.2d 1001, the Court, in reversing and rendering judgment, stated, "This case has been fully developed and there is nothing to be gained by a further trial of the same."

We feel that had the Supreme Court on the former appeal not been of the opinion that the "no evidence" points were invalid, it would not have reversed and remanded such cause. There was no suggestion in this Court that such cause was not fully developed and the Supreme Court did not indicate that such suggestion had been made to it. Surely, under Rule 505, the interests of justice did not require this case to be remanded if a fully developed record did not contain any evidence on which appellees under proper submission of the case could prevail.

■ Point eleven is that the trial court erred in permitting appellees, over objection, to introduce evidence as to the control ex-

ercised by appellant over carrier boys in the distribution of its papers.

The evidence does not show that Cargile used carrier boys, although he was assisted by members of his family and he had one employe to help him in his work.

The evidence objected to has been set out under our statement relating to the first ten points.

Cargile's business relationship with appellant was identical with that of Wheeless and Behrman, who testified to the control exercised by them over carrier boys. If Wheeless and Behrman could employ carrier boys, so could Cargile. While Cargile apparently did not need carrier boys if his district had been enlarged as appellant had the right to do, then the employment of car- rier boys by Cargile would, no doubt, have been necessary.

In our opinion, the evidence admitted was admissible on the issue of appellant's right of control which appellant had over Cargile. Only the exercise of this control was lacking as to Cargile because the condi- tions which would activate actual control had not occurred. Point eleven is over- ruled.

Point twelve is that the trial court erred in admitting in evidence, over objection, Behrman's testimony that Mr. Granath told him, in referring to his written contract with appellant that it was "not worth the paper it is written on. It is made to pro- tect the company." The objection was that it is an attempt by Mr. Granath "to state his own understanding of a written contract and its effectiveness." Also, the testimony was objected to on the ground that it was prejudicially irrelevant and immaterial.

We do not understand that the objection made comprehends the further objection that Mr. Granath, being an agent, could not bind his principal by the statement if it is otherwise admissible.

■ If this statement was one of fact, rather than a mere expression of opinion, it

was admissible. Texas General Indemnity Co. v. Scott, 152 Tex. 1, 253 S.W.2d 651.

■ Under the circumstances of this case, we hold the statement made is, or at least is subject to the interpretation that it is, a statement of fact. It, in effect, told Mr. Behrman that he was to take instructions from Mr. Granath concerning the details of his work regardless of the fact that he, according to the written contract, was an independent contractor.

The statement attributed to Mr. Granath was certainly prejudicial to appellant. Our reading of the Supreme Court opinion leads us to believe that that Court considered the statement material. We also believe it material on the issue submitted to the jury inquiring whether the written contract had been abandoned by appellant insofar as controlling the details of Cargile's work was concerned. Point twelve is overruled.

Points thirteen through twenty-four are jointly briefed. We will so consider them. They relate to jury findings that Cargile was negligent and that his negligence proximately caused the collision between the Franklin car and appellees' car.

We quote from appellant's brief the following statement made under these points:

"The accident occurred on the three-lane highway that runs generally north and south between Austin and Bastrop. The time was just before dawn on April 11, 1959. It was raining and foggy and, by the undisputed evidence, 'you could not see very far.'

At the Montopolis Bridge, two disinterested witnesses, Thomas Janak and E. D. Koehn, watched the Buick automobile of Otis Franklin hurtle past them at a speed of 70 miles per hour and disappear to the south over a hill. Janak and Koehn continued south for about one-quarter to one-half-mile and came upon the collision. Franklin's car had collided head-on, in the easternmost lane of the highway, with ap-

pellees' pick-up truck. The force of the collision had virtually welded the two vehicles together.

The physical facts showed that Franklin had so completely lost control of his car that it had partially run off the west side of the pavement, and had then skidded broadside, with its rear wheels in the mud and its front wheels on the pavement, for about 130 feet, collided with and demolished a barricade that was 4 to 5 feet off the west side of the road, caromed off the barricade clear across the west and middle lanes of the highway, straightened its course due south again, and collided head-on with the Love pick-up truck, 148 feet south of the barricade and 278 feet south of the point where it had left the pavement.

Janak, Koehn, and the police investigating officer all testified that, when Franklin was pulled from the wreckage, he smelled strongly of alcohol. Franklin admitted that he had been drinking, had not slept that night, and had been in an 'all-night cafe' from midnight until 5:00 a. m.

The only known witnesses to the accident were Franklin, Cargile, and appellees, the Loves. Mr. Love does not remember the accident, Mrs. Love was not asked whether she remembered it or not, and Cargile did not testify. The only description of Cargile's actions is the testimony of Otis Franklin. The account elicited from him by counsel for appellees is as follows:

'Q All right. Now, if you will, just explain in your own words what happened as you came upon or as you got near the scene of this collision, and what happened when you first saw a vehicle up in front of you; just tell them where you were, where the vehicle was, and what happened.

A. I was in the center lane going towards Bergstrom, and as I was coming upon a vehicle about a hundred feet in front of me, I was driving there and I saw that I could go on in the middle lane; and just as I was about fifty feet behind this vehicle, it started pulling over into my lane. So when I saw that I could not go up the middle lane without hitting this vehicle, I slightly touched my brakes and pulled to the right, trying to go down the right hand lane, and when I did, my car must have went in some kind of a skid or something, and I tried to straighten it up, and that is the last thing I remember.

\* \* \* \* \* \*

Q All right. Now, all that I want to know is, you have told us the Jeep station wagon was in the far right or extreme west hand lane; is that correct?

A Yes, sir.

Q That you were approaching it and overtaking it in the middle lane?

A Yes, sir.

Q How fast would you estimate, if you can, was the Jeep station wagon traveling?

A He was traveling at a slow rate of speed. I would say around fifteen or twenty miles per hour.

Q All right. And how far would you estimate the distance to be when you first observed the taillights, or what did you observe first on the car?

A I observed the car pulling over into my lane.

Q Well, when you first observed the car in the right hand lane, before he pulled over into your lane, about what distance would you estimate— and I am not intending to imply a distance here—between the back of his car and the front of your car?

A Around a hundred feet.

Q Then the distance you are talking about from the rear of the car in the right hand lane to the front of your car, when you first saw the vehicle in the right hand lane, was about a hundred feet?

A Yes, sir.

Q All right, sir. Then, as you approached the slow moving Jeep station wagon, which was in the right hand lane, and you were in the middle lane, from your testimony you have indicated the Jeep turned to the left into your lane?

A Yes, sir.

Q Now, as best you can, what is the approximate distance between the front of your car and the rear of his car when he started his turn into your lane of traffic, or when you realized he was turning into your lane of traffic?

A Around fifty feet.

Q All right. Then, if I have understood you correctly, you slightly touched your brakes and tried to go to the right; is that a correct representation?

A Yes, sir.

Q And as you tried to straighten up, you lost control of your car?

A Yes, sir.

Q Well, you said while ago, as best you remember after your four beers and staying up all night, that this car here started towards your lane of travel?

A Started turning over in my lane, yes, sir.

Q All right. Did he get all the way over there?

A He got part way in my lane.

Q And did he get all the way over there?

A No, sir, he didn't.

Q He never did get all the way over there?

A No, sir.

Q How far did he get over there?

A He got far enough that I knew if I kept up in that lane I would have hit him.

Q Which lane?

A In my middle lane.

Q Well, how about the right hand lane?

A Well, he had part of his rear in the right hand lane, too.'

There is no jury finding or evidence that Cargile failed to signal his intention to turn into the center lane. There is no evidence of the nature of the terrain north of the point where Franklin attempted to pass Cargile—i. e., in back of Cargile—except the testimony of Koehn that the countryside between the bridge and the scene of the accident is 'kind of rolling and hilly.' The undisputed evidence is that Cargile's jeep is approximately 6 feet wide, Franklin's Buick is about the same width, and each of the lanes of the highway is 12 feet wide. There is no evidence that, at the time Franklin attempted to pass Cargile, there was any traffic other than Franklin, Cargile, and appellees."

■ By reference to our former opinion it will be observed that the evidence is about the same here as there regarding the negligence of Cargile, the major difference being that Cargile did not testify on this trial and there is no evidence that Cargile failed to signal his intention to change lanes or that he did not see the Franklin car until it went by him. The jury findings of negligence there were that Cargile failed

to keep a proper lookout and that he made a left turn without giving a proper signal. The negligence of Cargile in that appeal was not disputed. Here, the jury findings are that Cargile failed to keep a proper lookout for cars approaching from the rear and that he turned his car to the left when he could not do so with safety.

It is our opinion that the evidence supports these findings as well as the findings that such negligent acts were proximate causes of the collision and that all such findings are not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We consider our discussion of proximate cause in the former opinion to be applicable in principle here and we refer to it rather than repeat it.

As to the findings of negligence, we said in our former opinion that the negligence of Mr. Cargile was "evident." We believe it to be evident here. The manner in which Mr. Cargile drove his car is the same as before, except that it is not shown that he failed to signal. The jury found that the Franklin car was driving in excess of 45 miles per hour at the time, and witnesses who saw the car one and one-fourth miles from the collision testified the Franklin car was going seventy miles per hour. Under these circumstances the failure to give a signal does not seem to have much bearing on the jury finding that Cargile made a left turn when he could not do so with safety. It seems to us that the jury was well within its proper field in making this finding even though it had no information as to whether Cargile gave a signal.

We reach a similar conclusion as to the finding of Cargile's negligence in failing to keep a proper lookout for cars approaching from the rear. We do not have Cargile's affirmance or denial of this conduct. Circumstantially the evidence overwhelms that he did not look to the rear before changing lanes. If he had done so he would have seen the Franklin car or, if not seeing it, he would not have been able to see far enough

to the rear to warrant the belief that he could change lanes with safety.

Points thirteen through twenty-four are overruled.

Points twenty-five and twenty-six are jointly briefed and will be so treated. These points relate to alleged improper jury argument of appellee's counsel in commenting on appellant's failure to use Cargile as a witness.

We quote the argument made by counsel for appellees in his closing argument:

"Incidentally, with regard to how this accident happened, if we are not right and it didn't happen just as we say it happened and as the testimony here shows it happened, why don't they bring in Mr. Cargile and let him tell us we are wrong. You know that they would have had him here explaining if there is any one thing about this turning proposition that wasn't correct. A judicial proceeding is not a place to hide evidence; it is a place to present it and get the truth out, all the truth, and then let the chips fall where they may."

Following this argument, counsel for appellant received assurance that as part of his objection the record showed that Mr. Cargile was present in the Courthouse and equally available to both sides. Counsel for appellees then made this argument:

"All right; now, I will explain—equally available to put on? My friends, when you put your witness on the stand, you can't cross-examine him; you have to accept what they say. If I had put these newspaper witnesses on as my witnesses, I couldn't cross them. I couldn't challenge them, I couldn't show that they weren't testifying like they had been, where would I be? Now, that is the unfair position that they are trying to put the plaintiff's case in, by concealing and hiding information which they ought to have available to them, and do."

In the opening argument counsel for appellees stated that, "if they even suggest that I should have put Mr. Cargile on as my witness, then I will answer that in rebuttal."

Counsel for appellant did not comment on appellees' failure to use Cargile as a witness in his argument to the jury.

Cargile had a business relationship with appellant, here determined to be employer and employe, when the incident giving rise to this suit occurred and when this suit was tried. He was a defendant in the previous trial and the judgment obtained against him has become final.

We believe the argument complained of to be a fair comment on the failure of appellant to call Cargile as a witness under the rule that it is proper "for counsel to comment in argument on the unexplained failure of the opposite party to call as a witness and offer the testimony of one who the record shows to be legally available, and who, while employed by such party, obtained or was clearly in a position to obtain material information on a point at issue in the litigation." Tex-Jersey Oil Corporation v. Beck, 157 Tex. 541, 305 S.W.2d 162, 68 A.L.R.2d 1062.

Points twenty-five and twenty-six are overruled.

Points twenty-seven through thirty are jointly briefed and will be so discussed. These points are, in effect, that there was no evidence to support the jury finding that the reasonable present cash value of necessary special training for Connie Gail Love in the future until she becomes 21 years of age was $15,000.00, and that such finding was against the weight of the evidence.

Dr. Empress Zedler is a professor of psychology. She is Director of the Speech, Hearing and Language Clinic at the Southwest Texas State College at San Marcos. She trains and supervises teachers for brain injured children and has done research in this field for ten years. She testified at

some length concerning the need of Connie Gail Love for this type of special treatment. As to the cost of this treatment, she testified:

"From your experience, Dr. Zedler, what does that type training, that special training that you have described for us—what will it cost?

MR. GAY: Your Honor, we object to it unless it is with reference to some particular locality where the child might be expected to receive it. * * *

Q Dr. Zedler, of course, you understood, I am sure, I mean from your experience, which is in Central Texas, is it not?

A Yes, sir. I have literature from elsewhere.

Q No, from your experience in the area in which you work, tell us what this type training costs on an hourly basis or monthly, or however you can best estimate it.

A Five and a half dollars an hour is the minimum, so far as I know when a trained person is teaching a child.

Q All right; thank you ma'am. Basing your opinion on reasonable probability will that cost be any less in the future than it is now?

A No, sir. We can't get anybody to work for five dollars and fifty cents an hour; that is our trouble."

 It is true that reasonableness of the cost of future treatment must be shown. The question presented is whether the above testimony is of sufficient probative force to sustain the jury finding of reasonableness. There is no direct testimony that the charges for this treatment are reasonable. The record is not, however, in the same condition as found in Dallas Ry. & Terminal Co. v. Gossett, 156 Tex. 252, 294 S.W.2d 377, cited by appellant. There the Court stated, "We thus are left with the amount of the charges as the only evidence in this record which might throw any light on the reasonable value of the services rendered."

There is much more in this record than the bare cost of the training. A very highly qualified and experienced person, Dr. Zedler, testified, not to her charges, but to the charges which, to her knowledge, are made in this area for the type of training required by this child.

We believe that this testimony of Dr. Zedler bears on the reasonableness of the charges made for this training. It is the equivalent of the testimony considered in Sam v. Sullivan, Tex.Civ.App., 189 S.W. 2d 69, Galveston, writ ref., w. o. m., where testimony as to the usual and customary charges for nurses, approved by a physician, were held to raise the issue of reasonableness of the charges. This case was noticed in Gossett, supra, without disapproval. Also see Canales v. Bank of California, Tex.Civ. App., 316 S.W.2d 314, Eastland, writ ref., n. r. e.

 Testimony that the minimum rates in this area for teachers for the type of training needed by Miss Love are $5.50 per hour, in our opinion, a sufficient basis for the jury to determine their reasonableness. Rates generally charged in an area are certainly usual and customary. There is a strong relationship between the words, "reasonable," "usual" and "customary." Martin v. Fletcher, 77 Or. 408, 149 P. 895. Under these circumstances, we consider them synonymous. Points twenty-seven through thirty are overruled.

Points thirty-one through thirty-four are jointly briefed, and will be so considered.

 These points are that there is no evidence to sustain the jury finding that $900.00 is the reasonable cash value of necessary medical services which will in reasonable probability be rendered to Connie Gail Love before she becomes 21 years of age; also, that such finding is against the great weight and preponderance of the evidence.

The following testimony of Dr. Robert G. Farris, in our opinion, sufficiently supports the finding of the jury, and we hold that such finding is not against the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust:

"Q Basing your opinion again, Dr. Farris, on reasonable probability, will Connie Gail need medical attention in the future after her seizures begin?

A It is my opinion that it is probable that this child will develop seizures and will require medical treatment in the control of the seizures.

Q For how long after that time will she require and need medical attention, Dr. Farris?

A I should say in my opinion I believe that after these seizures develop, which I believe they are likely to do, probably will, that she will require indefinite control, so long as she lives.

Q Could you give, Doctor, and again basing your opinion on reasonable probability, what you would estimate her medical expenses will run each year in the future after that occurs? Just a general average.

A I would estimate about a hundred dollars a year.

Q Now, will you break that down— not necessarily break it down, but what would that consist of—what type services, Dr. Farris?

A Well, for reasonable control we would assume that the child would have about one electroencephalogram during each year to judge the effect and to guide the control, which costs thirty to thirty-five dollars. She would probably need about forty or forty-five dollars worth of medicines a year, and she would need occasional visits to the doctor's office, and an occasional blood count.

Q Why would the blood count be necessary?

A Well, these medicines that are taken to prevent the convulsions may suppress the bone marrow and may cause damage to the bone marrow. It is necessary to check that occasionally to see if that is occurring.

Q I see. Well, would you recommend, once they begin, that she have all the services you just explained to the jury from a medical standpoint to give her proper care?

A I would consider that that outlined treatment would be reasonable. certainly not excessive.

\* \* \* \* \* \*

Q All right. Now, you have said also that allowing some thirty dollars a year for an e. e. g. and some more for medicine, anticonvulsants, and some more for visits to the doctor and blood tests, that you would expect to spend about a hundred dollars—that their family would have to spend about a hundred dollars a year if these seizures ever started; now, is that your testimony?

A I believe that that would be correct. It would be a reasonable estimate.

\* \* \* \* \* \*

Q Doctor, in addition there will be testimony that for electroencephalograms, the two that you have described to the jury, the charge was a total of $55.00. Were those electroencephalograms necessary for your proper evaluation and treatment of Connie Gail?

A Yes, sir.

Q And is the sum of $55 a reasonable charge for those e. e. g.'s?

A Yes, sir."

We overrule these points.

Appellant's remaining points, thirty-five through thirty-eight, jointly briefed, are, in substance, that the finding of the jury

that the present reasonable cash value of medical services which in reasonable probability will be rendered Connie Gail Love in the future but after she becomes 21 years of age is $5000.00 is supported by no evidence and is against the weight and preponderance of the evidence.

The evidence to support the answer of the jury to this issue is the same as that set out above to support the jury answer that $900.00 medical services would in all reasonable probability be required before Connie Gail Love reached the age of 21 years. We are of the opinion that the finding of $5000.00 for medical services beyond the age of 21 years is not without evidence to support it, and it is not so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. These points are overruled.

It is our opinion that the judgment of the trial court should be affirmed. It is so ordered.

Affirmed.

ARCHER, C. J., not participating.