The **FROST NATIONAL BANK OF SAN ANTONIO, Appellant,**

v.

Lewis **KAYTON, Administrator of the Estate of Roy Campbell Booth, Deceased, Appellee.**

No. 15378.

Court of Civil Appeals of Texas, San Antonio.

July 23, 1975.

Rehearing Denied Sept. 10, 1975.

Sawtelle, Goode, Davidson & Troilo, John W. Davidson, Terry Topham, Richard A. Flume, Jr., San Antonio, for appellant.

Lang, Cross, Ladon, Boldrick & Green, San Antonio, for appellee.

KLINGEMAN, Justice.

This is a suit for damages by appellee, Lewis Kayton, permanent administrator of the estate of Roy Campbell Booth, against the Frost National Bank for physical loss of the value of improvements to real estate and their contents occurring during Hurricane Celia. The Bank cross-claimed against Kayton for a contribution in the event the Bank should be held to have breached any duty to the estate of Roy Campbell Booth. The case was tried to a jury and, in answer to special issues submitted to the jury, the jury found: (1) that the Bank was negligent in failing to obtain extended coverage insurance (hurricane, wind, etc.) for the property in issue; (2) that the Bank's negligence was a proximate cause of monetary damages to the estate; (3) that, in the exercise of ordinary care, the Bank should have obtained extended coverage insurance for the improvements and their contents in the sum of $75,000.00; (4) that Kayton did not know nor should have known that such improvements were not covered by extended coverage insurance; (5) that the reasonable cost of repairs to the improvements in issue which would have been covered by extended coverage insurance was $62,-817.38; (6) that the difference in the market value between the contents located in the improvements which would have been covered by extended coverage insurance before and after damages thereto was $7,500.00. The trial court entered judgment upon the verdict of the jury against the Bank in the sum of $70,313.78 and denied the cross-claim of the Bank against Kayton.

Although the Bank asserts twenty points of error, they can be divided into three general categories and will be so discussed in this opinion: (1) points of error pertaining to liability; (2) points of error pertaining to admission of evidence; and (3) points of error pertaining to damages awarded.

Roy Campbell Booth died intestate at the age of 33 years, leaving an estate valued in excess of $600,000.00 of which approximately $325,000.00 was in liquid negotiable assets. The death certificate of Mr. Booth, which was introduced into evidence, listed the cause of death as (a) alcoholic brain disease, (b) acute alcoholism, and (c) chronic alcoholism. Included in the assets of the estate were certain properties located at Port Aransas, Texas, consisting of Milliboo Motel and cottages and the Malibu Club, which are sometimes referred to as "Milliboo-Malibu," a rent house on Cotter Street, and a residence on Sea Secret Street. The litigation here involves only the Milliboo-Malibu properties. The Milliboo-Malibu properties suffered severe property damages in Hurricane Celia, which losses were not covered by the type of insurance poli-

cies which the temporary administrator had on such properties.

Frost National Bank was appointed temporary administrator of the estate of Roy Campbell Booth on July 11, 1969, and qualified on July 14, 1969, by taking the required oath and bond. About a month after the Bank's appointment, it assigned trust officer Stanley R. Lobley to take charge of the Booth estate. Mr. Lobley testified that he was responsible for the insurance on the various properties; that he discussed the matter of insurance coverage on the various properties with Mrs. Sally Walsh of the Heilbron Insurance Agency in September or October of 1969 and was aware that the insurance coverage on Milliboo-Malibu did not contain extended coverage (windstorm, hurricane, hail, etc.). He testified that at this time he purchased insurance with this type of coverage on the Cotter Street property and the Sea Secret Street property which carried excess premium rates of three times the normal rate; that at such time he also discussed the matter of premium on this type of insurance on the Milliboo-Malibu properties; that the rates for this type of insurance were three times the normal rate; that the extended coverage insurance on such Milliboo-Malibu properties would cost approximately an additional $1,000.00 a year; that the estate was able to pay for such insurance but that he did not think it was the prudent thing to do considering the high cost of the premiums and the relative low risk involved. There is testimony that he made no independent investigation to determine the frequency of hurricanes, high winds or hail and did not consult with other banks and trust officers, or motel owners or other property owners on the Gulf Coast area. There is also testimony that the Milliboo-Malibu properties are worth about $160,000.00, approximately one-fourth of the value of the total assets of the estate.

After the Bank had served as temporary administrator for about a year, Lewis Kayton, the grandfather of the deceased's minor son, made application to become permanent administrator; and, on the afternoon of Wednesday, July 29, 1970, Kayton executed oath, filed his bond and qualified as administrator of the estate of Roy Campbell Booth.

On Thursday, July 30, 1970, a tropical depression had formed in the northwestern Caribbean Sea; on Friday, July 31, 1970, the National Hurricane Center reported that the weak cyclone moved northwestward and crossed the western tip of Cuba. On Saturday, August 1, at 5:00 p. m., Celia was upgraded to the status of a hurricane by the National Hurricane Center. On Sunday, August 2, hurricane watches were put into effect for the Texas coast from Corpus Christi northward and on Monday, August 3, hurricane warnings were put into effect. Hurricane Celia crossed the Texas coastline midway between Corpus Christi and Aransas Pass on August 3, 1970, at approximately 3:30 p. m. At the time of the hurricane, Frost had not filed its final account and no order discharging the Bank had been entered.

## Liability

■ By a number of points of error, appellant asserts (a) that there is no evidence to support the jury's answers to special issues No. 1, 2, 3 and 4,[1] and that the jury's answers to such special issues were against the great weight and preponderance of the evidence, (b) that there was no

1. Special Issue No. 1—that the Bank was negligent in failing to obtain extended coverage insurance for the improvements in issue.
   Special Issue No. 2—that the Bank's negligence was a proximate cause of monetary damages to the estate.
   Special Issue No. 3—that in the exercise of ordinary care, the Bank should have obtained extended coverage insurance for the improvements and their contents in the amount of $75,000.00.
   Special Issue No. 4—that Kayton did not know nor should have known that the improvements to the real estate in issue were not covered by extended coverage insurance.

duty on the part of appellant to insure the premises, (c) that the court erred in overruling appellant's motion for instructed verdict.

In reviewing appellant's no evidence points of error, we may consider only that evidence, if any, which viewed in its most favorable light supports the jury's findings, and we must disregard all evidence which would lead to a contrary result. *Biggers v. Continental Bus System,* 157 Tex. 351, 303 S.W.2d 359 (1957); *Ford v. Panhandle and Sante Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914). However, we must review all of the evidence submitted to the jury to determine if the verdict is against the great weight and preponderance of the evidence. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert, "No Evidence" and "Insufficient Evidence," 38 Tex.L.R. 361 (1960).[2]

The applicable rule for passing on motions for instructed verdict as set forth in 3 McDonald, Texas Civil Practice, Section 11.-28.2 (1970), is as follows:

"[U]pon motion for instructed verdict, the trial court, without passing upon the credibility of witnesses, accepts as true all evidence which, when liberally construed in favor of the adverse party, tends to support such adverse party's contention (as to the truth of the fact propositions on which he relies or the falsity of those urged by the movant); indulges every reasonable inference which can properly be drawn in favor of such opponent's position from the evidence; and discards all contradictory evidence favorable to the movant. If, so viewed, the evidence amounts to more than a scintilla, i. e., more than a mere suspicion or speculation that the fact propositions asserted by the opponent might be true or that those urged by the movant might be

false, as the case may be, an issue is at least raised." (Citations omitted)

Appellant asserts a multi-pronged attack on the judgment involving the area here involved. It complains, among other things, that (a) there was no duty on the part of appellant to insure the premises, in that appellee had qualified as permanent administrator of the estate prior to the damages by Hurricane Celia, and that, at the time of the damages to the property involved, appellee had superseded the Bank as administrator and that the Bank had no authority to insure the premises after July 29, 1970, and any failure of the Bank to obtain insurance on or before such date could not have been the proximate cause of the damages; (b) in any event, it asserts that if it had a duty to insure the property, the duty of an administrator is only to use reasonable care to preserve property from loss or damages and if fulfilled its duty by maintaining the type of insurance it had; that an ordinary prudent man under the same or similar circumstances would not have maintained extended coverage insurance due to the high cost involved and the relatively low exposure in connection therewith; (c) the negligence of the Bank, if any, could not have been the proximate cause of the monetary damages to the estate in that the evidence shows that the damage was caused by tidal wave or rising waters, and under the exclusions in an insurance policy containing extended coverage insurance, this type of loss is not covered; that even if appellant had obtained extended coverage insurance, the damage involved would not have been paid; (d) even if appellant was negligent in not maintaining such type of coverage, appellee was also negligent in that appellee had qualified as permanent administrator prior to the occurrence of the damages and his failure to secure such type of insurance was also negligence; (e) the overwhelming weight and preponderance of

2. We may not set aside a jury's finding unless we are so impressed from a consideration of all the testimony that such findings are so against the great weight and prepon-

derance of the evidence as to be clearly wrong and manifestly unjust. *Clark v. Brewer,* 498 S.W.2d 957, 959 (Tex.Civ.App. —Corpus Christi 1973, no writ).

the evidence shows that appellee knew or should have known that the property did not have extended coverage insurance, and if the Bank was negligent, appellee was also negligent; (f) under the record, there is no credible evidence to support the jury's answers to Special Issues No. 1, 2, 3 and 4, and, in any event, the jury's answers to such Special Issues are against the great weight and preponderance of the evidence.

Appellant asserts that the evidence shows (1) the decision by the Bank not to insure the property involved for the extended coverage insurance was a conscious, deliberate decision; (2) the deceased himself did not carry extended coverage insurance on such property; (3) improvements were well constructed and the risk involved did not justify the high premiums for extended coverage insurance; (4) the estate had a great need for cash with notes, bills, claims and obligations to be paid; (5) the Milliboo-Malibu properties had lost money from 1966 through 1968; (6) the Bank had had bad experiences with extended coverage insurance on properties which were damaged by Hurricane Beulah; (7) Hurricane Celia was an unusual hurricane in that it had severe high winds and relatively low storm tides; (8) the greatest risk from a hurricane is rising water, which is excluded under extended coverage insurance; (9) the Bank was not temporary administrator at the time of the loss to the Milliboo-Malibu properties.

Appellee urges that there is ample evidence to support the submission of and the jury's answers to Special Issues No. 1, 2, 3 and 4.

There is evidence that the damages were caused by high winds and/or rainfall and not by rising tides. A copy of a report of the U. S. Department of Commerce on Hurricane Celia was introduced into evidence which states, in part, that Celia's extreme winds caused the greatest destruction; that Port Aransas and Mustang Island, which took the brunt of Hurricane Celia, suffered damages to 75 percent of the buildings and that most of the damage was caused by wind and not water. Various photographs of the property involved, taken after the hurricane, were introduced into evidence which showed extensive damage to the improvements, including blown off roofs and timber, boards and other parts of the building blown away from the building and scattered about. It is obvious from the pictures that extreme damage was caused by the high winds. Several witnesses testified as to the accuracy of such photographs, and that such pictures accurately depicted the damages.

Winford Smith, president of the Island State Bank at Port Aransas, a witness for Frost, testified that he observed the loss to the Milliboo-Malibu, and that he did not believe the tides "got up there."

Plaintiff's (appellee's) witness, Coleen Cody, testified she went to the Milliboo-Malibu the weekend after the hurricane and that she saw no evidence of any high tide water; that if there had been high tide water, there would have been marks on the walls and other things, and there were no water marks and no evidence of water getting up to the motel. Lewis Kayton testified that he went to Port Aransas after the hurricane, that at such time there was no water inside the motel; that he could see where water had been on the floors and on the carpets; that there were no water marks on the walls; that the rains came in and it had "lots of rains." Birdie Goodwin, manager of Milliboo-Malibu, testified as to the extent of the damages; that the damage was caused by the hurricane and the rains; and when asked about the damages, she stated that it was mostly wind damage and there was not too much water until the rains started.

With regard to appellant's contention that the testimony shows that even if the property had been covered by extended coverage insurance, the loss would not have been paid, there is testimony to the contrary. Sally Walsh, an insurance agent who testified for the Bank, stated, "If there had been extended coverage on the proper-

ty, I imagine it would have been paid almost totally."

There was testimony that damages suffered by the Cotter Street property and Sea Secret Street property in Hurricane Celia and covered by extended coverage insurance had been paid. There is testimony that policy holders had no trouble getting paid for losses sustained during Hurricane Celia. F. Burton Barnes, an insurance agent, testified that the rising water exclusion in the extended coverage insurance applies to water that rises from the floor level into the structure, and that the question really is, which came first, the wind or the water.

Appellant also asserts that there is no evidence to support the jury's answer that Lewis Kayton knew or in the exercise of ordinary care should have known that the Milliboo-Malibu was not protected by extended coverage insurance, and that such answer is against the great weight and preponderance of the evidence.

It appears from the record that Lewis Kayton did not qualify as administrator until the afternoon of Wednesday, July 29, 1970. By July 30, 1970, a tropical disturbance had crossed the Atlantic and formed a tropical depression in the northwestern Caribbean Sea. By Friday, July 31, the tropical storm had become a weak cyclone which moved across the western tip of Cuba, and on Saturday, August 1, the National Hurricane Center upgraded the storm to the status of a hurricane. Mr. Kayton testified that he did not recall seeing anything about Hurricane Celia until he read it in his Sunday newspaper on August 2, 1970. There were introduced into evidence, copies of relevant San Antonio newspapers for all dates between Wednesday, July 29, 1970, and the date that the damages were sustained, which indicate that Hurricane Celia was first reported on Sunday, August 2, 1970. The hurricane crossed the Texas coast midway between Corpus Christi and Aransas Pass at about 3:30 on the afternoon of August 3.

Moreover, Kayton testified that at the time Hurrican Celia hit, he had not received the insurance policies on the Milliboo-Malibu complex. Although there is some testimony that an insurance agent told Kayton that the property had fire and lightning coverage only, Kayton testified positively that no one ever told him or otherwise gave him any indication that such properties were not covered by windstorm, hurricane and extended coverage insurance prior to the time of the damages, and that he assumed that Frost Bank was carrying extended coverage insurance. He testified that he was shocked when Lobley, after the storm, told him for the first time that there was no extended coverage insurance on Milliboo-Malibu.

Moreover, there is testimony that even if Kayton had known of the lack of extended coverage insurance, he could not have obtained such insurance after he qualified as administrator. There is evidence that a tropical disturbance was brewing as of that time, and by July 30, had formed a tropical depression in the Carribean Sea. While the evidence is somewhat conflicting, there is evidence that, in such a situation, an insurance agent would not thereafter have written such insurance.

With regard to appellant's no duty contention, it appears from the record that on July 14, 1969, Frost Bank qualified as temporary administrator of the estate of Roy Campbell Booth. The general rule is that a temporary administrator, having qualified, is charged with the duty of reasonable care to preserve the estate. *Barfield v. Miller*, 70 S.W.2d 632 (Tex.Civ.App.—Amarillo 1934, writ dism'd); 18 Tex.Jur.2d, Decedents' Estates, Section 357 (1960). The Probate Code provides that a personal representative must take such care of estate property as a prudent man would take care

of his own property. Section 230, Tex.Prob. Code Ann. (1956). See also *McMullen v. Sims*, 37 S.W.2d 141, 144 (Tex.Comm'n App. 1931, holding approved); *Richardson v. McCloskey*, 276 S.W. 680, 684 (Tex.Comm'n App.1925, opinion approved). There is testimony that the duties of trustees and administrators with respect to preserving assets are basically similar. In Professor Bogert's treatise on the law of trusts, it is stated: "[T]he trustee has a duty to secure the type of insurance necessary for protection, in order to preserve the trust property against destruction or diminution in value. If he fails to obtain any insurance, or the insurance is inadequate, the trustee will be liable to the beneficiary for the loss arising from the lack of protection." Bogert, Trusts and Trustees, Section 599 (2d ed. 1960).

Mr. Lobley testified that it was the general policy of the Frost National Bank Trust Department to buy fire and extended coverage insurance; that as an ordinary rule he would buy fire and extended coverage insurance on assets belonging to a decedent even if the assets were not mortgaged. Beverly Rust, head of the Frost National Bank Trust Department, testified that in this situation Lobley made an exception to the general rule. W. T. Burk, a retired trust officer, testified that it is almost an inviolate rule to insure any property with the usual and customary coverage—fire, windstorm, hail, extended coverage.

Section 189 of the Tex.Prob.Code Ann. (1956) provides that a personal representative shall be deemed to have qualified when he shall have taken and filed his oath and bond and has the same approved by the judge.

Section 221 of the Probate Code provides that no resigning personal representative shall be discharged until the application has been heard, the exhibit and account examined, settled and approved, and until he has satisfied the court that he has delivered the estate, if there be any remaining in his possession, or has complied with all lawful orders of the court with relation to his trust. There is evidence in the record that the Bank's final account had not been made or filed until sometime after the loss here involved and that the Bank had not been discharged at such time.

The jury found appellant to have been negligent and that such negligence was the proximate cause of the damage involved. There is more than a scintilla of evidence to support such findings and such findings are not against the great weight and preponderance of the evidence. The jury also exonerated Kayton of any responsibility for the damages and there is sufficient evidence to support such findings. The trial court did not err in overruling appellant's motion for instructed verdict. All of appellant's points of error pertaining to the question of liability are overruled.

## Admission of Evidence

By four points of error, appellant complains of the admission into evidence of (a) certain documents (deeds of trust, executor booklet, Kayton memo); (b) certain testimony of W. T. Burk.

By such points of error, appellant asserts that such evidence was erroneously admitted, and that the effect of such erroneous admission was to substantially increase the burden of proof required of appellant.

## The Deeds of Trust

█ There was introduced into evidence, over appellant's objection, a number of deeds of trust covering property on the Texas coast and the Port Aransas area. Such deeds of trust were given by persons who had borrowed money from the Frost National Bank and which indebtednesses

were secured by deeds of trust liens on coastal property. The pertinent portions of such deeds of trust complained of provide substantially as follows: "To insure and keep insured all improvements now and hereafter created upon such said property against loss or damages by fire and windstorm and any other hazard or hazards as may be reasonably required from time to time by the beneficiary."

Frost objects to such evidence on two basic grounds: (1) the deeds of trust are not relevant evidence in that the standard of care required by one department of the bank, the lending department, has no relevance to the standard of care required of an administrator; (2) that the Bank was required by law to have such a provision in deeds of trust securing loans.

Appellee says such evidence is relevant and material and is admissible on a number of bases: (a) they were made on coastal property in the same region in Texas, (b) they were executed before, during and after the Bank's administration and the storm, (c) they reflect the course of conduct and custom by the same defendant and throw light on the standard of care used by the Bank to protect its interest in this type of property, (d) the documents confirm the Bank's knowledge and appreciation of the probability of loss and damages to Texas coastal property from windstorm.

In support of appellant's contention that it was required by law to have such type of provision in deeds of trust on loans held by it, the Bank relies on Article 342, Tex.Rev. Civ.Stat.Ann. (1973), and in particular, Article 342–504, Section 2(d). Section 342 is sometimes referred to as the Texas Banking Code. Under such Article, *state banks* are authorized to make loans upon security of real estate and invest their funds in obligations secured by real estate subject to certain rules and regulations required by such Article. Article 342–504 provides in part that no state bank shall make a loan upon security of real estate or invest its funds in obligations secured by real estate unless: Section 2(d) "if the improvements situated upon such real estate constitute an appreciable portion of security, adequate coverage insuring the interest of the bank against loss by fire and tornado."

It is to be noted that appellant is a national bank, as its name indicates. The pertinent portion of the statute relied upon refers to state banks. It is also to be noted that the provision in the statute as above quoted calls for insurance against loss by fire and tornado. Random House Dictionary of the English Language (Unabridged 1966) defines a tornado as a localized, violently destructive windstorm occurring over land characterized by long, funnel shaped clouds. It defines a hurricane as a violent, tropical, cyclonic storm of the Western North Atlantic having winds of in excess of 72 miles per hour. The ordinary distinction is that a tornado is a localized, violent windstorm over land, while a hurricane is not so localized and is spawned over water. The provision in the deed of trust objected to contains a much broader provision than provided by the statute above referred to.

As a general rule evidence is relevant if it tends to prove or disprove a material fact involved or the question being tried. The material issue here involved is the standard of care required by an administrator. In determining this question, we have to look and consider all relevant evidence in the record.

### The Booklet

The booklet complained of by appellant is entitled "The Importance of an Experienced Executor" and bears the name Frost National Bank on its face. Such booklet points out the importance of having a

knowledgeable and experienced executor or administrator, and the portion here particularly involved states in effect: "Real estate for which the executor is responsible and tangible personal property require the executor's attention and should be adequately insured against fire and other hazards."

There is testimony by officers of the Bank that the booklet accurately portrays the standards of care exercised by the Bank and that the booklet is not false or puffed in any way.

Appellant asserts that the booklet was properly admitted by the trial court as an admission. See generally Anno.: Admissibility of advertisements, brochures, catalogs and the like as containing admissions by a litigant contrary to the position taken by him. 44 A.L.R.2d 1027, 1031, 1032 (1955); *Gould v. State*, 66 Tex.Cr.R. 122, 146 S.W. 172 (1912); *Sportatorium, Inc. v. State*, 104 S.W.2d 912 (Tex.Civ.App.—Dallas 1937, no writ); *Southern Pacific Co. v. Godfrey*, 48 Tex.Civ.App. 616, 107 S.W. 1135 (1908, writ ref'd). Appellee also asserts that the booklet accurately portrays the standard of care required by an administrator, and is relevant and admissible testimony.

### The Memo

■ The memo objected to (Exhibit 16) was a memorandum by Lewis Kayton, the permanent administrator, of a telephone conversation with Sally Walsh, an employee of an insurance corporation and a witness for the Bank. The substance of the alleged objectionable material in such memo is: (a) Mr. Lobley did not ask for any quotations on the cost of windstorm insurance on the Milliboo-Malibu property; (b) that the Bank needed an insurance person in their trust department who would help keep the Bank informed as to what type of coverage the Bank had; (c) when Mr. Lobley covered the Cotter Street and Sea Secret Street proper-

ties for windstorm and hail, he never mentioned Milliboo-Malibu.

The trial court, in admitting such evidence, stated that it met the basic requirements of a memorandum made in the regular course of business. Article 3737e, Tex. Rev.Civ.Stat.Ann. (Supp.1975).

Appellant asserts that the memo was not a business record and was not properly admitted as such; that, at most, it was but a random jotting or isolated memorandum. Appellee asserts that such memo was properly admitted because the evidence clearly shows and the trial court properly held that the memo qualified as a business record.

Mr. Kayton testified that he presently had an independent recollection of the telephone conversation with Mrs. Walsh here involved; that he made a memoranda of such conversion at such time; that as a part of his functions as administrator of the estate, he customarily made such memorandum on important matters; that he kept the memo as a part of the official files of the administration; that he prepared the memo about the conversation almost immediately; that such memo was accurate and correct; that it was kept in the usual and regular course of business of the estate and that such memo came out of the files of the estate.

While we do not feel such evidence should have been admitted because of its hearsay nature, we do not regard the admission thereof as harmful error.

### Testimony of W. T. Burk

■ Frost attacks the admissibility of Mr. Burk's testimony pertaining to the failure to provide extended coverage insurance on two basic grounds: (1) such testimony invaded the province of the jury; and (2) the use of the word "prudent" in his testimony constituted reversible error.

Mr. Burk testified in some detail as to his professional experience. He practiced law for a number of years; worked for the Reconstruction Finance Corporation for approximately 18 years, and served as assistant manager and loan manager; that he worked for the Groos National Bank from February of 1955 to December of 1970; and at the time of his retirement, was vice-president and trust officer. He testified that the trust department of such a bank acts as administrator and independent executor of estates; trustees under wills; trustees under other types of trusts; and guardians of estates of minors and incompetents; and that he was generally familiar with the habits, customs and operations of a prudent trust department and trust officer in administration of estates. He testified in some detail about the handling of insurance, factors to be considered, etc.

Appellant complains basically of the testimony of Mr. Burk as to the habit and custom of prudent trust officers acting in administration to purchase extended coverage insurance and, in particular, to the use of the word "prudent."

During the course of his testimony, the following testimony was elicited from Mr. Burk without objection:

"Q. Is there a rule customarily followed by a trust officer as to the purchase of insurance on a commercial building or business property held in an estate, and if so, please explain your understanding of that general rule?

A. My understanding of the general rule is that the administrator, the bank, owes a duty to the heirs and beneficiaries of an estate to protect the property against loss, and it is almost an inviolate rule to insure any property, any real estate owned by trust because of the fact that the failure to do so can lead to a surcharge of the bank.

Q. Now what type of coverage [sic] are you talking about?

A. I am talking about the usual and customary coverage, fire, windstorm, hail, plate glass . . . ."

There is other testimony elicited from employees of appellant with regard to the standard of care exercised by the Bank. There is testimony of the importance of having an experienced administrator; there is testimony that each of its trust officers are trained to handle or recognize insurance problems. The professional training or experience of Mr. Lobley, the trust officer of the estate here involved, was presented to the jury, and he was qualified as an expert. He testified that his decision not to purchase liability insurance on the property involved was based upon his total experience. With regard to appellant's objection to the use of the word "prudent," Mr. Lobley himself testified that he had not purchased extended coverage on the property involved because he did not think it was the prudent thing to do at the time.

With regard to appellant's contention that Burk's testimony invaded the province of the jury, see 1 McCormick and Ray, Texas Practice, Section 1395 (1956), wherein it is stated:

"The reason usually given is that such testimony would invade the province of the jury. If such statements were literally enforced opinion evidence would practically disappear from the courtroom and the fact finders would be robbed of one of their best aids in determination of difficult issues. Despite the wide currency of such expressions it is believed that they are unsound. Furthermore the controlling cases from the Texas Supreme Court do not support any general rule forbidding properly qualified witnesses from giving opinion upon facts which are the ultimate issues in the case. On the

contrary it is believed that such opinions are receivable whenever they are likely to be of appreciable aid to the jury in arriving at the correct conclusion."

See Norvell, Invasion of the Province of the Jury, 31 Tex.L.R. 731 (1953).

Although we consider some of the objected to evidence of dubious materiality, we do not consider the admission of such testimony or any part thereof as harmful error. Rule 434, Tex.R.Civ.P. (1967), provides that no judgment shall be reversed on appeal on the grounds that the trial court has committed error in law during the course of the trial unless the appellate court be of the opinion that the error complained of amounts to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. In determining whether an erroneous admission of evidence constituted harmful error, a reviewing court will consider the record as a whole. *Shelton v. Belknap,* 155 Tex. 37, 282 S.W.2d 682 (1955). Whether a particular error was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case is always a judgment call to be made according to the reviewing court's opinion from a review of the entire record in the case. *Gomez Leon v. State,* 426 S.W.2d 562 (Tex. 1968); *Texas Power and Light Company v. Hering,* 148 Tex. 350, 224 S.W.2d 191; Appellate Procedure in Texas, Harmless Error, Section 17.112(2).

As heretofore noted, in some instances, similar evidence containing the substance of the objected to evidence was admitted without objection. Generally, the court's admission of evidence over objection is deemed harmless if the objecting party permits similar evidence to be admitted without objection. *Delhi Gas Pipeline Co. v. Heddin,* 508 S.W.2d 417 (Tex.Civ.App.—Tyler 1974, no writ); *City of Houston v. McFadden,* 420 S.W.2d 811 (Tex.Civ.App.—Houston [14th District] 1967, writ ref'd n. r. e.); *Rowe v. Liles,* 226 S.W.2d 253 (Tex.Civ.App.—Waco 1950, writ ref'd).

Even if we disregard all the objected to evidence, there is sufficient evidence of probative value in the record to support the jury's answers to the issues pertaining to standard of care. There is other evidence, some of it by the Bank's officers and employees, as to the standard of care required of an administrator which sufficiently supports the jury's answers. Under such evidence, the jury could have reasonably believed that the Bank as administrator of the estate did not exercise that degree of care which would be used by a person of ordinary prudence under the same or similar circumstances in failing to have one of the estate's most valuable assets located on the Texas coast insured against loss by fire and windstorm.

## Damages

Appellant, by a number of points of error, complains of the damages award. It asserts that (a) there is no evidence to support the submission of or the jury's answers to Special Issue No. 8[3] and Special Issue No. 9[4]; (b) there is no competent evidence to show the reasonable cost for repairs to the

---

3. The jury, in answer to Special Issue No. 8, found that the reasonable cost for repairs which would have been covered by extended coverage insurance and which would have been necessary to restore the Milliboo Motel and cottages to the condition in which they were immediately before being struck by Hurricane Celia on August 3, 1970, was $62,817.38.

4. The jury, in answer to Special Issue No. 9, found that the difference in the market value for the furniture, fixtures and equipment located in the Milliboo Motel and cottages and the Malibu Club immediately before and immediately after being struck by Hurricane Celia which would have been covered by extended coverage insurance was $7,500.00.

improvements on the Milliboo-Malibu properties; (c) there is no competent evidence of the damages to the contents of the Milliboo-Malibu properties.

■ We will first consider appellant's contention with regard to the cost of repairs. Both parties agree that the amount of $62,817.38 found by the jury as the reasonable cost of repairs represents the total of a repair estimate made for Frost in the amount of $59,640.00, plus temporary repairs made on such properties shortly after the hurricane in the amount of $1,131.79 and $2,045.59. Appellee contends there is sufficient evidence to support such award because (1) there were four different estimates in evidence before the jury, and the jury accepted and used the lowest of such estimates; (2) Frost is in no position to complain about the estimate obtained by it; (3) appellant stipulated as to the authenticity and admissibility of such evidence; (4) Lobley, the trust officer testified that he had no reason to doubt the accuracy of such estimates; (5) the jury had before it pictures depicting the extent of the damages; (6) from all the evidence before it, the jury could fairly estimate the amount of the damages.

Appellee concedes that there is no direct testimony of the reasonableness of the cost of the repairs, but asserts that from all of the evidence before it, the jury could accurately estimate the amount of the damages, and there was sufficient evidence that the jury could make a finding as to the reasonableness of the amount of the damages.

In *Dallas Railway and Terminal Company v. Gossett*, 156 Tex. 252, 294 S.W.2d 377 (1956), the court said:

"In some jurisdictions proof of the expenses incurred or paid for the treatment of personal injuries is regarded as presumptive proof of the reasonable value of the services, provided the unreasonableness of the charges does not appear from other evidence. This rule has never been followed in Texas, and is now well settled that proof of the amounts charged or paid does not raise an issue of reasonableness, and recovery of such expenses will be denied in the absence of evidence showing that the charges are reasonable. . . . We hold that testimony showing only the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor does not constitute evidence of probative force that the charges are reasonable."

Appellee cites and relies on *Newspapers, Inc. v. Love*, 397 S.W.2d 469 (Tex.Civ.App.—Austin 1965), writ ref'd n. r. e. per curiam 405 S.W.2d 300 (Tex.1966); *Canales v. Bank of California*, 316 S.W.2d 314 (Tex.Civ.App.—Eastland 1958, writ ref'd n. r. e.); *Sam v. Sullivan*, 189 S.W.2d 69 (Tex.Civ.App.—Galveston 1945, writ ref'd w. o. m.); *Dillingham v. Currie*, 92 S.W.2d 1122 (Tex.Civ.App.—Amarillo 1936, writ dism'd); and *Texas and Pacific Railway Company v. Gurian*, 77 S.W.2d 274 (Tex.Civ.App.—El Paso 1934, writ dism'd) in support of their contention that direct proof of reasonableness is not required and that reasonableness may be inferred from other evidence.[5] In all of

5. (a) "Although testimony relative to the bill of the McAllen Hospital for $1,087.17 did not include a direct statement that it was reasonable, there was testimony that said charges were the usual and ordinary charges for such services. Under the circumstances, we think this is evidence of the reasonableness of that charge." *Canales v. Bank of California, supra.*

(b) "The nurses' bills were $6.00 a day. This was proved to be the usual and customary charge at the time the nursing services were rendered, and it was proved that the rates had since risen to $8.00 a day. It was proved that the bills had been approved by the physician in charge. We think that under the evidence, even though no expert testified that such bills were reasonable, there is sufficient evidence to raise the issue of reasonableness of the charge, and sustain a finding of reasonableness." *Sam v. Sullivan, supra.*

the cases cited by appellant, there is either testimony that the charges were usual and customary, or testimony that the charges were reasonable.

The problem here is that there is no testimony in the record before us that the costs for repairs shown in the estimates, or the costs of temporary repairs made, were the usual and customary charges, or that such charges were reasonable.

Appellant also relies on the testimony of Mr. Lobley that he had no reason to doubt the accuracy of the estimates. We do not regard such testimony as tantamount to testimony that the charges shown in such estimates were reasonable. Moreover, there is nothing in the record showing Lobley's qualification as an expert as to the cost of repairs on real estate improvements.

In a recent case, *Hyatt v. Tate*, 505 S.W.2d 373 (Tex.Civ.App.—Houston [1st District] 1974, no writ), a body shop foreman testified that (a) he estimates damages to automobiles; (b) his estimate of the damages to appellant's automobile was $476.69 as evidenced by his testimony and a written estimate introduced into evidence; (c) all repairs listed by him on such estimate were necessary to put the car in proper condition; (d) the company for which he worked would be willing to repair such automobile for such amount if brought to it on the date of the trial. He was not questioned whether $476.69 was a reasonable charge for the repairs. The jury found that the reasonable cost of repairs was $476.69. The trial court granted defendant's motion to disregard the jury's answer to such findings and rendered judgment that appellant take-nothing. On appeal, appellant contended that the testimony and the written estimate of the cost of repairs, together with reasonable inferences which may be drawn from

such evidence, was sufficient to support the jury's finding of $476.69 as the reasonable cost of repairs. The appellate court rejected such contention holding that there was no evidence before the jury to enable it to do anything more than to speculate whether the cost of repairs estimated by appellant's witness was reasonable.[6]

Under the record, the jury could only speculate as to the reasonable cost of repairs of the Milliboo-Malibu properties. We hold that there is no evidence to support the jury's answers as to the cost of repairs to the Milliboo-Malibu properties in that there is no evidence of probative value as to what is the reasonable cost of such repairs.

■ We next consider appellant's complaint with regard to the award for the damages to the contents of the Milliboo-Malibu properties. Appellant contends that there is no evidence showing what furniture, fixtures and equipment were located in the premises in question at the time of the hurricane, nor was there any evidence of the extent of the damages. On the other hand, appellant asserts that there is sufficient evidence to support the submission of and the jury's finding of $7,500.00 as the value of the furniture, fixtures and equipment destroyed in the hurricane.

The pertinent evidence in this connection may be summarized as follows: (a) There was introduced into evidence a statement (Plaintiff's Exhibit No. 4) purporting to list the property of the estate of Roy Campbell Booth for the period of time from 6–30–70 through 9–30–70, with a valuation of the various properties carried on such listing as "carrying value." One of the items listed therein is the furniture and furnishings in the courts and apartment at Port Aransas, with a carrying value listing of $9,993.25, and another item is a listing for the furni-

---

6. "The rule is, therefore, that it must be shown by both pleadings and evidence, that the amount so paid out was reasonable and the injured party is permitted to recover only such amount as would be reasonably incurred in repairing his property and restoring it to its former condition." *Tinney v. Williams*, 144 S.W.2d 344 (Tex.Civ.App. —Amarillo 1940, no writ).

ture, furnishings and fixtures of Club Malibu at Port Aransas with the carrying value therein shown of $5,582.53; (b) Lewis Kayton, permanent administrator of the estate, testified that to the best of his ability, he felt that the figures shown on such exhibits were reasonably accurate. He further testified that 40 to 50 percent of the personal property was destroyed in the hurricane; (c) Birdie Goodwin, the manager of such properties, testified that the biggest part of the furniture and furnishings had been destroyed.

It can be surmised that the jury accepted the valuation shown on the statement (Plaintiff's Exhibit No. 4), which totals $15,575.78 as the market value of such property on the date of the hurricane, and that they accepted Kayton's testimony that 40 or 50 percent of the personal property was destroyed as the after-hurricane value. However, there is no evidence showing that all or just what portion of such furniture, fixtures and equipment were present and located on the premises at the time of the hurricane. Nor is there any evidence what the market value of such property was immediately after the hurricane. Under the record, the jury's award for the contents (personal property) cannot stand.

We do not have the power to remand solely to determine damages only. See *Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648 (1958); Pope and Sheehan, A Proposal to Limit the Scope of New Trials in Texas, 7 St. Mary's L.J. 1 (1975). However, because of the reasons hereinbefore set forth, this case must be reversed.

The judgment of the trial court is reversed and remanded.