**Al PENA, Individually and D/B/A Alco Industries, Appellant,**

v.

**Debbie LUDWIG, Appellee.**

**No. 10–87–179–CV.**

Court of Appeals of Texas, Waco.

Jan. 19, 1989.

Rehearing Denied Feb. 16, 1989.

Charles M. McDonald, Tina M. Koemel and Dick Kettler, McDonald, Harmon & Malone, Waco, for appellant.

Greg M. Dykeman, Strong, Pipkin, Nelson & Bissell, Beaumont, for appellee.

## OPINION

THOMAS, Chief Justice.

This appeal involves the Texas Deceptive Trade Practices Act (DTPA). *See* Tex.Bus. & Com.Code Ann. §§ 17.41–.63 (Vernon 1987 and Vernon Supp.1989). Debbie Ludwig, appellee, sued Alfred Pena, appellant, after he undertook to remodel a building which Ludwig intended to use as a hairstyling shop. She alleged Pena misrepresented the quality of his carpentry, plumbing and electrical services and breached express and implied warranties. The jury answered all liability issues in Ludwig's favor and awarded her $3,000 cost of repairs, $5,000 lost profits, $500 exemplary damages, and $7,000 attorney's fees. The court entered a $31,500 judgment for Ludwig by trebling actual damages to $24,000 and then adding the trebled sum to the award of attorney's fees and exemplary damages.

Questions on appeal relate to the court's trebling of actual damages, the evidentiary support for recovery of cost of repairs and lost profits, the charge, and an alleged comment on the weight of the evidence. The judgment will be reformed to delete $17,000 from Ludwig's recovery, but will be otherwise affirmed.

■ Only the "trier of fact" has the discretionary authority under the DTPA to treble actual damages in excess of $1,000. *Id.* at § 17.50(b)(1) (Vernon 1987); *Martin v. McKee Realtors, Inc.,* 663 S.W.2d 446, 448 (Tex.1984). If the jury awards actual damages, then the court must award "two times that portion of the actual damages that does not exceed $1,000." *Id.*

Ludwig concedes the court could not treble actual damages because it was not the fact-finder. The jury awarded actual damages, which required the court to award an additional $2,000 by doubling the first $1,000 of actual damages. *See id.* Therefore, Pena's first point attacking the court's authority to treble actual damages is sustained.

Pena questions in his second and third points whether the evidence was legally and factually sufficient to support the award of $5,000 lost profits. He contends Ludwig could not recover lost profits because her business was new and unestablished and because she failed to provide objective evidence from which the jury could calculate lost profits with reasonable certainty. He also argues she failed to prove a causal connection between lost profits and his wrongful conduct.

Lost profits may be recovered if they are the natural and probable consequences of wrongful conduct and their amount is shown by competent evidence with reasonable certainty. *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938). Proof to a mathematical exactness is not required because measuring lost profits is an inherently speculative undertaking. *White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983); *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348 (1955). Even the rules by which lost profits are measured cannot be exactly stated. *Pace Corporation,* 284 S.W.2d at 348. Thus, a defendant cannot escape liability merely because the plaintiff cannot state or prove a perfect measure of lost profits. *Id.*

Lost profits are usually proved by comparing the business done by the plaintiff's established concern during a not-too-remote comparable base period with the business done by plaintiff's concern during the comparable period for which recovery is sought. *Southwest Battery Corporation,* 115 S.W.2d at 1099. Lost profits may also be recovered for the normal increase in business which might reasonably be expected to have occurred, in light of past developments and existing conditions, over the business actually done in the base period. *Id.*

■ Lost profits of a new or unestablished business generally cannot be proved to a reasonable certainty due to the absence of a prior base period for comparison. *See id.* However, lost profits may be recovered for a new enterprise, if factual data is otherwise available to furnish a sound basis for computing probable losses. *Universal Commodities, Inc. v. Weed,* 449 S.W.2d 106, 113 (Tex.Civ.App.–Dallas 1969, writ ref'd n.r.e.); *see Pace Corporation,* 284 S.W.2d 340. Whether the evidence is sufficient to support a finding of lost profits must be determined from the facts of each case. *Automark of Texas v. Discount Trophies,* 681 S.W.2d 828, 829 (Tex. App.–Dallas 1984, no writ).

Ludwig, at age thirty-seven, was an experienced hairstylist and instructor, having worked in at least ten hairstyling shops and owned four shops over fifteen years. She kept the books, made the day-to-day business decisions involved in managing her shops, and was primarily responsible for designing, decorating and promoting the successful opening of at least three of her own shops. Dwight Belicek, the owner of Armstrong–McCall Wholesale Beauty Supply, described her as an "expert," "very, very smart," and "very, very business minded." She had a reputation as a shop owner, according to Belicek, for knowing "the insides and outs of profits and books" and for being a "very sharp business person when it comes to advertising and setting up ... [a new shop]."

Ludwig and her husband bought and remodeled a building in the Midway Center to start their first hairstyling shop, but growth in business forced them in May 1985 to move the shop to a larger building

in the Hewitt Plaza. The relocated shop, which they renamed Lone Star Barber & Hairstyling, was still in operation at the time of the trial. Ludwig and her husband then divorced under an agreement which apparently gave him the Lone Star shop, allowed her to start new shops, but prohibited her from directly soliciting Lone Star customers.

Ludwig decided in late May 1986 to open a new shop in the Hewitt Plaza, just "around the corner" from her ex-husband's Lone Star shop, and picked June 30 as the target date for the opening. She leased space for the shop on June 2, entered into an oral contract with Pena in the first week of June to do the carpentry, electrical and plumbing work necessary to ready the premises for occupancy, bought furniture and fixtures, and arranged a $3,000 bank loan. Pena agreed to finish the remodeling within one week from the date he started. Despite repeated pleas from Ludwig and after numerous excuses for delay on his part, Pena finally abandoned his uncompleted work on July 16, five weeks after he started. Ludwig immediately employed Collier Electric, A–1 Plumbing, and carpenter John Boykin to repair the electrical, plumbing and carpentry work which Pena had improperly done and to finish remodeling the premises. She finally opened on July 28 under the name "Haircrafters" with three hairstylists.

Haircrafters was still in business, but had not yet earned a profit, when the suit against Pena was tried eleven months later. Ludwig attributed Haircrafters' lack of profit to her inability to advertise the opening and operation of the new shop. She claimed Pena's shoddy work and delay forced her to use the proceeds from the $3,000 loan, which she had intended to use for direct mail advertising, to repair and complete the abandoned work and to pay her living expenses. The bank refused to loan her another $3,000 for advertising, and Haircrafters could not generate funds for direct mail advertising between its opening and the trial because it was barely paying its rent and utilities.

Ludwig contended that advertising, particularly direct mail zone advertising, is vital to the opening of any new hairstyling shop. Dwight Belicek ranked television advertising higher than direct mail, but agreed that opening a new shop without advertising its existence would be "financial suicide." Ludwig claimed that Haircrafters would have been as profitable as Lone Star's initial operation, if she could have obtained the funds to advertise. Belicek described Haircrafters as a "very nice shop" and knew of no reason why it would not be successful if people knew of its existence. He believed that two shops located near each other, both equally as nice and operated the same way, would have similar profits.

Ludwig used the $35,000 profit, which she said Lone Star earned over a six-month period in 1985, as the basis for estimating Haircrafters' lost profits during the eleven-month period between its opening and the date of the trial. She first doubled Lone Star's six-month profit to obtain an annual profit of $70,000, then multiplied the $70,000 annual profit by $\frac{11}{12}$ths ($70,000 $\times$ $\frac{11}{12}$ths = $64,167) to calculate Lone Star's profit for a base period comparable to the eleven-month period for which she was seeking recovery of lost profits by Haircrafters. Next, she divided Lone Star's eleven-month profit by six ($64,167 $\div$ 6 = $10,694) to determine the average amount of profit produced by each of Lone Star's six hairstylists during the eleven-month base period. Finally, she multiplied $10,694 by 3 ($10,694 $\times$ 3 = $32,083) to calculate the total profit that three hairstylists working at Haircrafters should have produced from its opening to the date of the trial. These figures exclude Ludwig's inconsequential miscalculations in her testimony. Then, to allow for "unforseen situations ... and to take in all possibilities," Ludwig arbitrarily reduced her estimate of Haircrafters' lost profits from $32,083 to $15,000.

Ludwig had opened another Haircrafters shop in October 1986 on the Texas State Technical Institute campus, which was still operating when the suit was tried in June 1987. The campus shop had been opened

and operated, according to Ludwig, with sufficient advertising. She testified that in 1987 each full-time hairstylist at the campus shop would produce an average annual profit of $11,000, an amount she used to reinforce her estimate that each of the three hairstylists at the Hewitt location would have produced an average annual profit of $10,694, if the shop had been properly advertised.

Pena argues that Ludwig could not use Lone Star's profits as the basis for calculating Haircrafters' lost profits. In *Barbier v. Barry*, 345 S.W.2d 557, 563 (Tex.Civ. App.–Dallas 1961, no writ), the court rejected an attempt by the plaintiff to establish lost profits for a new business by reference to profits earned by Charat in a separate, established business. The facts in *Barbier*, which can be distinguished from the facts of this case, show there was a material difference between the plaintiff's new business and Charat's established business: the plaintiff in *Barbier* was prevented by contract from manufacturing a certain product, while Charat could manufacture that product under his contract. *Id.* This material difference prevented any viable comparison between the two businesses. The court in *Barbier* did not expressly nor impliedly hold that lost profits can never be calculated by reference to a separate business.

Logically, the location, services, personnel, and management of two separate businesses could be so similar that the business and profits of one would serve as a reliable basis for calculating lost profits of the other. The peculiar facts of this case fit within this logical assumption. Ludwig was primarily responsible for opening Lone Star and Haircrafters as new shops in the Hewitt Plaza, was intimately familiar with their personnel, management, operation and financial condition, knew the area where both operated, and no doubt would have continued to be responsible for Lone Star's day-to-day management if she had not divorced. If she had been a co-owner of Lone Star at the time of the trial, and had opened Haircrafters merely as an extension of Lone Star's existing location, then the argument against using Lone Star

as the basis for calculating Haircrafters' probable loss would virtually disappear. The factual data relating to Lone Star's operation, based on Ludwig's unique knowledge and operation of both shops, was sufficient to provide a sound basis for calculating Haircrafters' probable loss, even though Lone Star was a separately owned entity. *See Universal Commodities, Inc.*, 449 S.W.2d at 113.

Pena also contends Ludwig could not recover lost profits because Haircrafters was a new and unestablished business. He cites a number of cases which follow the general rule that lost profits of a new or unestablished business are too speculative to be recovered because there is no base period which can be used for comparison. *See Southwest Battery Corporation*, 115 S.W.2d at 1099. Our holding that Lone Star's profits can be used as the base for determining Haircrafters' probable loss disposes of this argument. That Haircrafters had operated at a loss or at "break-even" for eleven months did not preclude a recovery of lost profits. *See Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 257–58 (Tex.App.–Corpus Christi 1987, writ ref'd n.r.e.) (holding a business operated at a loss may still suffer further damage by the wrongful conduct of another); *Pace Corporation*, 284 S.W.2d at 349 (allowing recovery of lost profits for a relatively new wholesale business that had never operated at a profit).

■ Furthermore, Pena alleges Ludwig's "opinion" of the amount of Haircrafters' lost profits was not probative evidence because it was not supported by objective facts, figures and data. He points out that she did not introduce any of Haircrafters' business records to show that her new business was capable of making a profit.

Authority does exist that opinions or estimates of lost profits must be based upon sufficient objective facts, figures or data from which the amount of loss can be established with reasonable certainty. *See e.g. Frank B. Hall & Co.*, 733 S.W.2d at 258; *Village Square, Ltd. v. Barton*, 660 S.W.2d 556, 560 (Tex.App.–San Antonio

1983, writ ref'd n.r.e.); *Automark of Texas*, 681 S.W.2d at 830. Apparently, this rule is meant to preclude recovery based solely on unsupported opinion testimony from an interested party on the amount of loss. *See e.g. Village Square, Ltd.*, 660 S.W.2d at 560 (holding plaintiff's testimony that he had suffered $225,000 lost profits was not probative because it was not based upon "fact, figures or data of any kind").

This court has not found any blanket requirement that a witness' testimony, which is based on first-hand knowledge of financial data, must be supplemented in every instance by the financial records from which actual knowledge is gained. Indeed, there is authority to the contrary. An accountant testified in *Frank B. Hall & Co.* that she had examined a company's invoices and determined that the plaintiff lost $377,414 in gross revenue. *Frank B. Hall & Co.*, 733 S.W.2d at 258. The president of plaintiff then testified that his company would have earned a 70% profit on the $377,414 lost revenue. *Id.* Apparently, the testimony of these two witnesses was not reinforced by any other objective facts, business records or data, but the court held their testimony was sufficient to uphold an award of $240,000 in lost profits. *Id.* Likewise, a plaintiff's "experience" in the sale of farms and ranches was held to support his opinion testimony of "what he ... could reasonably expect to earn in the future" in his relatively new business. *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 536 (Tex.Civ.App.–Corpus Christi 1979, writ ref'd n.r.e.).

Ludwig testified from actual, personal knowledge about Haircrafters' financial condition as well as Lone Star's six-month profit, which she used as the beginning point for calculating Haircrafters' probable loss. This was not opinion testimony on her part, but testimony based upon first-hand knowledge of their business records. To hold Ludwig's testimony was not probative, merely because she did not reinforce it with Haircrafters' and Lone Star's business records, would require something not otherwise demanded of a witness testifying from personal knowledge of business records. She did more than guess at the amount of Haircrafters' lost profits. She outlined a reasonable methodology, using Lone Star's profits from a comparable period, to calculate Haircrafters' probable loss for a comparable period. Any question about the reasonableness of Ludwig's methodology or the factual basis for her testimony goes to its weight and not admissibility. *See State Nat. Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 695 (El Paso 1984, writ dism'd by agr.). Ludwig's testimony on lost profits had probative value even though it was not supplemented by underlying business records.

■ Lost profits can be recovered if they are the natural and probable consequences of wrongful conduct. *Southwest Battery Corporation*, 115 S.W.2d at 1098. Haircrafters' lost profits were the natural and probable consequence of Pena's shoddy work and delay and Ludwig's inability to advertise because of a lack of funds. This consequence was reasonably forseeable by Pena. Accordingly, because the evidence was legally and factually sufficient to establish a causal connection between Pena's wrongful conduct and Haircrafters' lost profits and to support an award of $5,000 lost profits, points two and three are overruled.

■ Pena alleges in points four and five that the evidence was legally and factually insufficient to support an award of $3,000 as cost of repairs. He contends Ludwig failed to prove the amounts she paid for carpentry, plumbing and electrical repairs were reasonable. These points must be sustained.

A party seeking cost of repairs must prove the repairs were not only necessary but reasonable in amount. *GATX Tank Erection v. Tesoro Petroleum Corp.*, 693 S.W.2d 617, 619 (Tex.App.–San Antonio 1985, writ ref'd n.r.e.). Proof of the amount paid does not prove its reasonableness. *See Frost National Bank of San Antonio v. Kayton*, 526 S.W.2d 654, 666–67 (Tex.Civ.App.–San Antonio 1975, writ ref'd n.r.e.).

Although the evidence established the necessity of the repairs and the amounts

paid by Ludwig, the record is devoid of any evidence that the amounts paid were usual and customary or reasonable. *See id.* Points four and five are sustained.

■ Pena admitted referring people to the work site, but denied that he or any employee of his had done any carpentry, plumbing or electrical work for Ludwig. The court defined "Alfred Pena" in the charge as including "Alfred Pena individually and doing business as Alco or Alco Industries and *any* employees, agents or representatives acting on behalf of Alfred Pena, Alco and Alco Industries." (Emphasis added). Pena objected to the definition as a comment on the weight of the evidence because, as he pointed out, he had denied performing any carpentry, electrical or plumbing work for Ludwig, either personally or through any agents or employees. However, the objection was overruled. He argues on appeal that the court should have included the words "if any" in the definition to avoid impliedly commenting that he had acted through agents or employees.

The court shall not directly comment on the weight of the evidence in its charge. Tex.R.Civ.P. 277. The definition was correct: "Alfred Pena" did include Pena, individually, and *any* employees, agents and representatives acting on his behalf. By including the word "any" in the phrase "any employees, agents or representatives acting on behalf of Alfred Pena," the court did not indicate that Pena must have acted, if at all, only through employees, agents or representatives. The word "any" left the jury free to determine whether Pena acted, if he did, either personally or through *any* employees, agents or representatives. The jury could have reasonably disbelieved Pena's testimony, found he had personally performed carpentry, electrical or plumbing work for Ludwig, and answered the questions in the same manner, without ever determining he had acted through other persons.

However, assuming the court impliedly commented on a contested issue by omitting the word "if" before the word "any" in the definition, every implied comment on

the evidence does not require a reversal. *Alvarez v. Missouri–Kansas–Texas R. Co.*, 683 S.W.2d 375, 377 (Tex.1984). It becomes harmful only if it probably resulted in an improper judgment. *Id.* Examining all of the facts in the context of the charge as a whole, one cannot say that omitting one word from the charge resulted in the entry of an improper judgment. *See* Tex. R.App.P. 81(b)(1). Point six is overruled.

■ Pena also requested written definitions of "agent" and "employee," which the court refused. The question under the eighth and ninth points is whether the court committed reversible error when it refused to submit the definitions.

Rule 277 requires the court to submit such instructions and definitions "as shall be proper to enable the jury to render a verdict." Tex.R.Civ.P. 277. The court has broad discretion in deciding whether a term should be defined. *Wolters v. Wright*, 649 S.W.2d 649, 651 (Tex.App.–Texarkana 1982, writ ref'd n.r.e.). It does not have to define a term if the context in which it is used indicates the term is to be given its usual and ordinary meaning. *Magnolia Petroleum Co. v. Long*, 126 Tex. 195, 86 S.W.2d 450, 455 (1935). A definition is required only for a term used in a technical or legal sense. *Id.*

The court did not abuse its discretion when it refused to define the terms "employee" and "agent" because the context in which they were used in the definition of "Alfred Pena" indicated they were not to be given a technical or legal meaning but their usual and ordinary meaning. Furthermore, assuming the court erred when it refused to submit the definitions, one cannot say that their refusal necessarily resulted in the entry of an improper judgment. As already noted, the jury could have reasonably believed from the evidence that Pena had acted personally, rather than through agents, employees or representatives, and still answered all of the questions as it did. Accordingly, the error would have been harmless. *See* Tex.R. App.P. 81(b)(1). Points eight and nine are overruled.

■ Pena complains in point seven about the court submitting the following question over his objection:

*Question No. 6*

Do you find that Alfred Pena failed to perform carpentry, electrical, and plumbing services for Debbie Ludwig in a skillful and workmanlike manner?

You are instructed that ["]skillful and workmanlike manner" means work that is done as a person skilled in that business should do it in a manner generally considered skillful by those capable of judging such work in the community of performance.

Answer "We do" or "We do not."

He argues on appeal that the question improperly assumed he had performed carpentry, electrical and plumbing services for Ludwig when he had expressly denied that he did.

Pena made the following objection:

The Defendant excepts and objects to Question Number 6 for the reason that there is no pleadings to support the giving of this issue, there is no evidence to support the giving of this issue, and that the jury is compelled and commanded by the Court's issue to answer "We do." Because of the way this issue is worded, the Court clearly states that, "Do you find that Alfred Pena failed to perform carpentry, electrical, and plumbing services for Debbie Ludwig in a skillful and workmanlike manner," the jury has no choice or no alternative other than to answer that question "We do," even though they believe the version of Plaintiff or even though they believe the version of Defendant. The main contested issue in this case is the fact that the Defendant is denying that he entered into any contract with Plaintiff. He further specifically and emphatically denied he performed any carpentry, electrical, and plumbing, and certainly he has not performed anything out there, in a skillful or unskillful manner or any workmanlike manner or unworkmanlike manner. That is a direct command of this jury to answer "We do," which is improper. It is a direct comment on the weight of the evidence, and amounts to a general charge.

Nowhere in the objection does he clearly and distinctly inform the court of his primary complaint: the question improperly assumed he performed carpentry, electrical and plumbing work for Ludwig. Although he pointed out that he denied performing such work, his specific complaint was that the question commanded or compelled the jury to answer affirmatively. Its wording did not compel such an answer because the jury could have answered negatively by believing Pena had performed the work in a good and workmanlike manner.

The objection did not comply with Rule 274 because Pena failed to clearly and specifically point out the error of which he was complaining or explain the grounds of the objection. *See* Tex.R.Civ.P. 274. Accordingly, it was properly overruled and did not preserve any error for appellate review. *See Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986). Point seven is overruled.

■ Pena's counsel cross-examined Ludwig about whether she was receiving child support. After her attorney questioned the relevance of that line of inquiry, the court and counsel for both sides engaged in a discussion of its relevance. Despite an apparent ruling that the evidence was irrelevant, Ludwig nevertheless insisted on answering questions about her child support, and Pena's counsel returned to that line of questioning. Again, Ludwig's counsel interrupted questioning to ask the court to instruct opposing counsel not to misquote prior testimony. The following then occurred:

THE COURT: All right. Well, I expect the jury heard whatever the testimony was. All right. Let's proceed. *Let's get across this child support here quickly.*

(Emphasis added). Pena promptly objected to the statement and made a motion for a mistrial, which the court denied.

Pena's final point is that the court's statement, "Let's get across this child support here quickly," constituted an improper comment on the weight of the evidence. He argues the court impliedly told the jury

that evidence of Ludwig's child support was unimportant and entitled to little weight.

A judgment should not be reversed for an error of law unless it amounted to such a denial of the appellant's rights as was reasonably calculated to result in the entry of an improper judgment. Tex.R.App.P. 81(b)(1). Assuming, without deciding, the court's comment was improper, one cannot reasonably say that, without it, the jury would have reached a different verdict or a different judgment would have been entered. Accordingly, based on the record as a whole, such an error would have been harmless. *See id.* Point ten is overruled.

The court should have entered a $14,500 judgment for Ludwig, which would include $5,000 lost profits, an additional $2,000 resulting from the court's doubling of the first $1,000 of actual damages under section 17.50(b)(1), $7,000 attorney's fees, and $500 exemplary damages. Therefore, the judgment is reformed to delete $17,000 from Ludwig's recovery. *See* Tex.R.App. P. 80(b)(2). The reduction includes $3,000 awarded as cost of repairs, which was unsupported by any evidence of reasonableness, and $14,000, which is the excess the court improperly awarded when it trebled actual damages. Otherwise, the judgment is affirmed as reformed.